## John W. Parker v. James W. Lynch *et al.*

(Filed July 30, 1898.)

1. JURISDICTION DEFINED. Jurisdiction is the authority by which courts and judicial officers take cognizance of and decide cases. Power to hear and determine a cause. If a court has jurisdiction of the persons to the action, and the cause is the kind of a cause triable in such court, it has jurisdiction of the subject of the action and has the power to render any rightful judgm.nt therein.

2. HOMESTEAD—*Contest—Rights of Parties—Trustee.* The offering to file a contest against a homestead entry, gives a party no interest in the land. By such offer, he acquires no vested right in any sense of the word. If the Land Department entertain a contest, and permit it to be filed, the party filing the same has the right to have it heard, but he has no right or interest in the land itself; and the fact that one offered a contest against a homestead entry, even though h's grounds named therein were valid, and the contest should have been entertained and a hearing granted, yet if the Department rejected his contest, he, by the offering of such contest, acquired no interest whatever in the land embraced in the entry, and he cannot maintain an action to declare the patentee, who was the entryman at the time he offered h's contest, a trustee, for his use and benefit.

(Syllabus by the Court.)

*Error from the District Court of Kay County; before A. G. C. Bierer, District Judge.*

*S. L. Overstreet,* for plaintiff in error.

*Pollock & Lafferty,* for defendant in error.

### STATEMENT OF FACTS.

This is an action commenced by John W. Parker, in the district court of Kay county, against James W. Lynch and the town of Ponca City, to declare a resulting trust. Judgment was rendered for defendant, from which plaintiff appeals to this court.

The original petition was filed on May 17, 1895. To this, the defendants interposed their respective de-

murrers on two grounds: (1) That the court had no juris-
diction of the subject matter of the action; and, (2) that
the petition did not state facts sufficient to constitute a
cause of action.     The record does not show that these
demurrers were sustained to plaintiff's petition, but the
sustaining of the demurrer to plaintiff's original petition
is assigned as error.     This court will not consider any
assignment of error which is not presented by the record.
It might be suggested, though, that this very question
was decided by this court in the case of *Kingman v. Pix-
ley*, this volume, p. 351.   The court held in that case that
when a demurrer is sustained to a petition, and plaintiff,
after obtaining leave of court, files an amended petition,
and the issues are joined thereon, and a trial had, the
plaintiff, by filing his amended pleading, waives any
error committed by the trial court, in sustaining such de-
murrer.   Citing, *Young, et al v. Martin*, 8 Wall. 354, and
*Rosa v. M. K. & T. R. R. Co.*, 18 Kan. 124.

It is shown by the record that plaintiff obtained leave
of court on August 10, 1895, to file an amended petition,
which was filed in due time.     The amended petition,
omitting the caption and exhibits, is as follows:

"The plaintiff, John W. Parker, leave of court having
been first obtained, makes, presents and files this his
amended petition, and for cause of action herein against
said defendants and each of them, alleges:

"That the said defendant, the town of Ponca City,
claims to be a municipal corporation duly organized and
existing under and by virtue of the laws of the Territory
of Oklahoma, but the true character of which this plain-
tiff does not know, and as a part of the lands within the
boundaries of said defendant, the town of Ponca City, is
the southwest quarter of section 27 in township 26 north
of range 2 east of the Indian meridian, in Kay county,
Oklahoma Territory.

"That this plaintiff now is and at all times he. einafter mentioned was a native born citizen of the United States, over the age of twenty-one years, and in all respects duly qualified under the homestead laws of the United States, and under the law and president's proclamation, (dated August 19, 1893, opening to homestead settlement certain lands in the Cherokee Outlet,) to make homestead entry of not to exceed 160 acres of said lands.

"That by said proclamation, under and by virtue of the laws of the United States, the president opened to homestead settlement, at the hour of 12 o'clock, noon, Central Standard time, September 16, 1893, among other lands, the said southwest one quarter of section 27, in township 26, north of range 2, east of the Indian meridian, in Kay county, Oklahoma Territory, which said lands were so opened to homestead settlement by reason of the act of congress approved March 3, 1893, and the said president's proclamation, dated August 19, 1893, and plaintiff avers that he at no time violated the law or the president's proclamation concerning the entry into, or upon the lands opened to settlement as aforesaid, or the regulations of the president or secretary of the interior, but in all things, strictly, legally and honestly complied with the law and the proclamation and the rules and regulations of the secretary of the interior concerning the opening, occupancy and settlement, and entry of and upon said lands, and, plaintiff avers, that on the 16th day of September, 1893, prior to the hour of 12 o'clock, noon, Central Standard time, of that day, the said James W. Lynch, contrary to law and the said president's proclamation, and the said rules and regulations of the secretary of the interior, wrongfully and without right, and in defiance of the law and said proclamation, entered upon the lands opened at the hour of 12 o'clock noon, Central Standard time, as herein aforesaid, and also procured and caused one David Pryor, as his agent and representative, to likewise enter upon said land, and as a special messenger in his behalf, to convey the homestead application and other papers accom-

panying it to make homestead entry of said southwest one quarter of section 27, township 26, north of range 2, east of the Indian meridian, Kay county, Oklahoma Territory, to the United States local land office at Perry, Oklahoma Territory, to which said land was attached.

"That as such agent and employee of said defendant, the said David Pryor as aforesaid, did, about the hour of 4 o'clock A. M., September 16, 1893, enter upon said lands, and as the agent and for the benefit of said defendant, James W. Lynch, did convey the homestead application of said defendant, and other papers accompanying it, as a special messenger, to the local land office at Perry, Oklahoma Territory, and presented and filed, or caused the same to be presented and filed there at about 12:30 o'clock, P. M., September 16, 1893.  That in so doing, the said David Pryor, as the agent of the said James Lynch, entered upon said lands so opened to settlement as aforesaid, near the north line thereof, and more than fifty miles from the said Perry land office, and in conveying said defendant Lynch's said homestead application as aforesaid, said Pryor entered upon and traveled over the lands so opened to settlement as aforesaid, for more than forty miles, prior to the hour of 12 o'clock noon, Central Standard time, September 16, 1893, and reached said land office, and the government townsite of Perry, within said lands so opened to settlement as aforesaid, and filed or caused to be filed his said homestead application, and other papers of said defendant, Lynch, long prior to the time that any one did, or could have reached said land office, or said government townsite of Perry, had they legally entered said lands from any point at the outer boundary thereof, as fixed by the law and the president's proclamation at the hour of opening, or at the point were said Pryor entered the same which said application was marked filed in said local land office at Perry, as rejected application No. 1; that afterwards on January 4, 1894, the said application was placed of record

Ly the register of said land office, as homestead entry No. 5030.

"Plaintiff further says that said application was not sworn to as required by law, nor as required by the rules and regulations of the interior department, nor before an officer authorized to administer oaths, nor presented and filed as required by the rules and regulations, or the laws of the interior department of the United States; that afterwards, the said James W. Lynch made application to commute said homestead entry, and purchase said lands for townsite purposes under the second proviso of section 22 under the Organic Act of the Territory of Oklahoma, and made final proof thereunder before B. N. Woodson, probate judge of Kay county, Oklahoma Territory, which said proof was by said Woodson transmitted to said register and receiver of said Perry land office, and by them transmitted to the honorable commissioner of the general land office of the United States.

"That afterwards, and about the 19th day of May, 1894, and prior to the approval of said final proof of defendant, by the commissioner of the general land office, and prior to the issuance and delivery of any certificate of purchase to said land to the defendant, Lnych, this plaintiff filed in the United States land office at Perry, Oklahoma Territory, his affidavit of contest against the said homestead entry and application of said Lynch, to commute the said southwest one-quarter of section 27, township 26, aforesaid. That afterwards, this plaintiff filed with the commissioner of the general land office, various affidavits of various persons corroborating his contest affidavit herein aforesaid; that afterwards, the honorable commissioner of the general land office in considering the premises, did not entertain this plaintiff's application to contest the said entry of defendant Lynch, but wholly failed and refused so to do.

"That afterwards this plaintiff filed an additional affidavit of contest amendatory and supplemental to his first aforesaid affidavit of contest against the defendant

Lynch's said homestead entry and townsite appl'cation.

"That afterwards, one J. W. Whitten, as special agent of the interior department of the United States, investigated the matters herein aforesaid, and made two several reports thereon, in which he filed and presented the affidavits of the defendant, James W. Lynch, and the said David Pryor, in which said affidavits said Lynch and Pryor admitted the allegations of the contest affidavit of this plaintiff.

"That afterwards the said homestead application of the said defendant Lynch, and all matters relating thereto, came on for consideration by the honorable commissioner of the general land office, and secretary of the interior. and upon consideration thereof, said honorable commissioner and secretary denied this plaintiff's right or application to contest the application and homestead entry of the defendant Lynch herein aforesaid.

"That afterwards and within the time allowed by the rules of practice of the interior department, this plaintiff filed his motion for a review of said decision; that afterwards, on the 11th day of January, 1895, the said honorable secretary denied this plaintiff's motion for a review of said matters, and denied this plaintiff's right to contest the said application and homestead entry of the defendant James Lynch. A copy of the deci ions of the commissioner of the general land office and secretary of the interior of the United States, and all papers filed and proceedings had in the United States land office at Perry, Oklahoma Territory, in the interior department, relative to said matter, showing all the facts herein aforesaid, being a complete record of all said proceedings, are filed herewith, attached hereto, marked 'exhibit A' and made a part hereof.

"Plaintiff further avers that at the time of filing his affidavit of contest as herein aforesaid, he made a deposit of money with the local United States land office at Perry, Oklahoma Territory, under and in accordance with

the rules thereof, to secure the payment of fees, costs and expenses of said contest, all as required by the rules and regulations of the land and interior department of the United States, which said moneys are still held by said land office and the department of the interior of the United States; that in the contest proceedings herein aforesaid, he has expended a large amount of money in addition to the deposit of said money as aforesaid.

"Plaintiff avers that the last decision of the secretary of the interior, as herein aforesaid being final, the said honorable secretary awarded said lands, to-wit: the southwest one quarter of section 27, in township 26, north of range 2, east of the Indian meridian, Kay county, Oklahoma Territory, to said defendant, James W. Lynch, and on January 12, 1895, caused the said land to be patented by the president to James W. Lynch, and caused said patent to be recorded in the recording department of the general land office of the United States, and caused said patent thereafter to be delivered to said defendant, James W. Lynch, thereby patenting and conveying to said James W. Lynch all the said lands except certain reservations, to said defendant the town of Ponca City; and plaintiff avers that at the time of the commencement of this action, the said defendants were the owners and holders of the legal title to said lands.

"Plaintiffs avers that the commissioner of the general land office of the United States, and the secretary of the interior in their proceedings, and in rendering their decision as aforesaid, and in denying this plaintiff his rights under the laws of the United States, to contest said application and homestead entry of the defendant James W. Lynch, under all the facts herein aforesaid, committed gross error and mistake of law and the acts of Congress, and the well known and established rules of practice of the interior department of the United States, in such case made and provided

"Plaintiff avers that the said defendant, James W. Lynch, was disqualified by reason of the allegations and facts herein aforesaid to make homestead entry to said tract of land, or to receive a patent therefor, and that his entry thereof was fraudulent and void, and ought to have been cancelled by the land department of the United States.

"That all of the statements made and set forth in the plaintiff's affidavit of contest and the affidavits corroborating the same concerning the fraudulent entry of the lands by the said James W. Lynch, were true; and if this plaintiff had been allowed to contest said entry and application, he could have, and would have proved said facts by competent evidence and testimony, and in fact all the allegations aforesaid were admitted by said Lynch and his agent, David Pryor, as herein aforesaid; and had plaintiff been permitted so to do, as was his right under the law, and to have conducted his contest as prayed for against said application and homestead entry, he could have and would have established the fact of the disqualification of said Lynch, to make homestead entry as herein aforesaid, and in addition to the moneys, the usual deposit by him as aforesaid, and so paid out by him as aforesaid, he could have, and would have paid the land office fees and procured the cancellation of said homestead entry and application of the said James W. Lynch, for the lands aforesaid, and thereby, under the law. acquired a preference right to make homestead entry of said tract.

"Plaintiff avers that he has in all things exhausted his right in the premises before the land and Interior department of the United States.

"That under the law and the facts he has acquired a vested right in the land herein aforesaid; that he is without adequate remedy at law in the premises without the aid of this honorable court in the exercise of its chancery powers; that he is now ready and willing to pay into court the sum of $400 for said tract of land, together

with the fees and expenses lawfully incurred in obtaining title to said tract of land, and that he is ready and willing, and will do equity in the premises as required by this honorable court."

The prayer was in the usual form.

From this petition and exhibits thereto attached and made a part thereof, it will be seen that Lynch, on September 16, 1893, made application to enter the land in controversy, by mail, at the United States land office at Perry, O. T., which application was rejected, but Lynch was not notified by the lard office of the action for a considerable time thereafter. When he was notified, he made an additional showing as to why his application was sent by mail, and it was placed of record, he having bought off all of the adverse claimants for the land.

After having secured his homestead entry, Lynch, on March 13, 1894, made application to purchase said tract under section 22 of the act of congress of May 2, 1890, which act is as follows:

"That the provisions of title 32, chapter 8, of the Revised Statutes of the United States relating to 'Reservation and sale of townsites on the public lands,' shall apply to the lands open or to be opened to settlement in the Territory of Oklahoma, except those opened to settlement by the proclamation of the president on the twenty-second day of April, eighteen hundred and eighty-nine; provided, that hereafter all surveys for townsites in said Territory shall contain reservations for parks, (of substantially equal area if more than one park,) and for schools and other public purposes, embracing in the aggregate not less than ten nor more than twenty acres; and patents for such reservations, to be maintained for such purposes, shall be issued to the towns respectively when organized as municipalities: Provided further, that in case any lands in said Territory of Oklahoma which may be occupied and filed upon as a homestead

under the provisions of law applicable to said Territory, by a person who is entitled to 'perfect his title thereto under such law, are required for townsite purposes, it shall be lawful for such person to apply to the secretary of the interior to purchase the lands embraced in said homestead or any part thereof for townsite purposes. He shall file with the application, a plat of such proposed townsite, and if such plat shall be approved by the secretary of the interior, he shall issue a patent to such person for land embraced in said townsite, upon the payment of the sum of ten dollars per acre for all the lands embraced in such townsite, except the lands to be donated and maintained for public purposes as provided in this section. And the sums so received by the secretary of the interior shall be paid over to the proper authorities of the municipalities when organized, to be used by them for school purposes only."

After due notice and publication, Lynch made his final proof, and thereafter, to-wit: on May 19, 1894, Parker filed a protest against the same, and asked to be permitted to contest Lynch's entry, which protest and application to contest was in the following language:

"Before the General Land Office, Washington, D. C., and before the local Land Office, Perry, O. T.

"Personally appeared before the undersigned authority, John W. Parker, who, being duly sworn, deposes and says: That he has been informed, and has good reasons to believe, that James W. Lynch, who made homestead entry for the southwest quarter of section 27, township 26, north of range 2 east, at the United States land office at Perry, O. T., on the 30th day of January, 1894, was not qualified to make said entry or to acquire title to said tract of land for the following reasons, to-wit:

"That said Lynch executed the affidavits which accompanied said application and upon which said entry is based, and procured one Pryor to fraudulently and in violation of the act of congress approved March 3, 1893,

and the president's proclamation dated August 19, 1893, to enter the Cherokee Outlet prior to 12 o'clock, noon, Central Standard time, of the 16th day of September, 1893, and subsequent to the date of said proclamation for the purpose of forwarding the homestead application of said Lynch to the United States land office at Perry, O. T.

"Affiant is informed, and has good reasons to believe and does believe, that said James W. Lynch executed said affidavits in support of said application before B. N. Woodson, now probate judge of Kay county, Territory of Oklahoma, prior to the existence of said county, and prior to the commencement of the official career of said Woodson, and also prior to the time that said lands applied for, were open to settlement and entry; that affiant is further informed and believes that the said B. N. Woodson delivered said homestead affidavits and application to one Pryor, and that said Pryor did enter the Cherokee Outlet prior to 12 o'clock, noon, Central Standard time, on September 16, 1893, and did take with him the homestead application and affidavits of said Lynch for the purpose of having the same delivered at the United States land office, Perry, O. T., through the United States mails, for the purpose of segregating the above described tract of land prior in point of time to any homestead application that would be executed and forwarded from the border of the Cherokee Outlet, in a lawful manner, and before any application could be lawfully presented in regular order of said land office; that said Pryor did deposit said application with a special delivery stamp thereon in the United States mail at a point within the Cherokee Outlet, and cause said application to be delivered at the United States land office at Perry, O. T., where the same was placed on record a rejected application, segregated said land from entry, and subsequently with the use of money, the said entryman cleared the record of all adverse claimants to said tract, and perfected his said homestead entry, thereafter.

"That in pursuance of the agency aforesaid, said Pryor did, prior to the hour of 12 o'clock, noon, Central Standard time, on September 16, 1893, enter said Territory and so file said homestead application.

"That affiant is further informed that said entryman made final proof under the second proviso of section 22 of the act of congress approved May 2, 1890, before B. N. Woodson, aforesaid, that said proof is now pending before the honorable commissioner of the general land office, Washington, D. C.

"That affiant is further informed and has good reason to believe, and does believe, that all of the allegations above set forth are true; and if true, said entry was fraudulent and void from its inception.

"Affiant further says that he has no sufficient personal knowledge as to the facts of the foregoing allegations and charges, so as to warrant him in making a positive oath as to the truth thereof, and is not able to secure a corroborating witness thereto; that affiant believes such facts are only within the personal knowledge of said entryman and his personal friends and persons controlled by them, and difficult to establish by voluntary testimony.

"Affiant says that he is acting in good faith in filing this contest, and the same is not initiated for the purpose of harrassing the claimant and extorting money from him under a compromise, but in good faith to prosecute the same to a final determination.

"Wherefore, affiant protests against the approval of said entryman's final proof for said tract, and the allowance of a cash entry thereon and prays that within the rule decided in the case of *Gotthelf v. Swinson*, 5 L. D. page 657, he be permitted to prosecute said contest; that a hearing be ordered and he be allowed an opportunity to prove the truth of the allegations and charges herein above set forth; and finally, that said homestead entry be cancelled and he be awarded a preference right to enter said tract of land.

"Affiant further respectfully prays that if in the discretion of the honorable commissioner it be considered that he ought not to be allowed to prosecute this contest, then that the entire matter be referred to a special agent for investigation and report, to the end that the government may not be cheated and defrauded out of said land.

[Signed]                              "JNO. W. PARKER.

"Subscribed and sworn to before me this 17 day of May, A. D., 1894.

[Signed]                         "ERNEST W. JONES.

  (SEAL)                              "Notary Public.

"My commission expires Sept. 26, 1897."

The affidavit, as will be seen, was not corroborated and did not contain any positive allegations as to Lynch's disqualifications, or other proper charge. Several weeks later, other affidavits were filed, but they were of the most general character. The Parker contest affidavit, and all of the affidavits subsequently filed by him, were passed upon by the commissioner of the general land office, and by him held to be insufficient, and the decision of the commissioner was reviewed and approved by the secretary of the interior. These several affidavits go principally to the manner in which Lynch secured his entry, or rather how he secured the filing of his homestead application in the land office, on the day the land was opened up to settlement, viz: September 16, 1893. After Parker's contest was filed, the commissioner assigned a special agent to investigate the charges made by Parker against Lynch. Lynch and Pryor both filed affidavits showing how Lynch's application was filed, and these two affidavits are not contradicted. Lynch's affidavit is as follows:

"Territory of Oklahoma, County of Kay, ss:

"Before me the undersigned authority, on this 12th day of September, 1894, personally appeared J. W. Lynch, of lawful age, who being first duly sworn, on his oath states that he is the entryman of the southwest quarter of section 27, township 26, of range 2 east; that after 10 o'clock P. M. on the 15th day of September, 1894, he was approached by one J. L. Pennington, live stock agent of the G. C. & S. F. R. R., who informed him that himself and a number of others intended to make their filings by mail from Arkansas City, in the state of Kansas; that they had counseled good legal authority, and were informed that they could legally make their filings in this way, being more than fifty miles from the land office; that they had a man engaged who would carry their applications to the post office at Arkansas City, and wait there so they would go to the land office on the first mail, and thereupon invited him, the said J. W. Lynch, to join them and send his application with theirs; that he did so, and delivered his application to be mailed, as he then understood it would be, at Arkansas City; that he did not learn until some months afterwards that it had reached the land office by a different route, and that the plan and method was changed without any knowledge, consent or direction on his part; that he has paid off and satisfied every adverse claimant to the land on which he made his filing except one Parker who filed his contest or protest long afterwards, to-wit: about April 19, 1894.

[Signed]            "J. W. LYNCH.

"Subscribed and sworn to before me this 12th day of September, 1894.

[Signed]            "G. B. BARNES.

(SEAL)            Notary Public.

"My commission expires March 10th, 1898."

Pryor's affidavit is in the following language :

"Territory of Oklahoma, County of K:

"Before me, the undersigned authority, on this 12th day of September, 1894, personally appeared David C.

Pryor, of lawful age, who being first duly sworn, on his oath states, that he is personally acquainted with one J. W. Lynch, the entryman of the southwest quarter of section 27, township 26, of range 2 east, in the said county and Territory; that on the afternoon or evening of the 15th day of September, 1893, he agreed with the said J. W. Lynch and certain other parties, to convey to the nearest post office, and mail to the register and receiver of the United States land office at Perry, O. T., their applications for filing; that at the time of making said agreement, he had an arrangement to have said applications mailed at Arkansas City, in the state of Kansas, but later learned that the mail train from Arkansas City would be delayed, without being authorized by the said J. W. Lynch to do so, carried the application of the said Lynch to the Red Rock post office, and there under a special delivery postage stamp, attempted to get the postmaster, one Joseph Schnell, to carry and deliver the same to the postmaster at Perry, but failing in said attempt, proceeded to carry the said application to Perry, where in person he delivered the same to the postmaster.

"Affiant further swears that he pursued this course and delivered the application of the said Lynch as aforesaid, without informing the said Lynch that he intended to do so, and without any knowledge on the part of the said Lynch, so far as affiant is aware.

[Signed]                                    "DAVID C. PRYOR.

"Subscribed and sworn to before me this 12th day of September, 1894.

[Signed]                                    "G. B. BARNES,
(SEAL)                                       "Notary Public.

"My commission expires March 10, 1898."

All of the affidavits, departmental letters and arguments of counsel, relative to Parker's application to contest Lynch's entry, were made exhibits to plaintiff's amended petition. The honorable secretary of the interior finally dismissed Parker's application to contest, and directed the patent to issue for the land to Lynch. Park-

er then filed a motion for review, before the department, which was, by the honorable secretary, denied, and Lynch then received his patent. To this amended petition, which shows all of the foregoing facts, each of the original defendants demurred on two grounds: (1) That the court had no jurisdiction over the subject of the action; and (2) that the petition did not state facts sufficient to constitute a cause of action. The Ponca City Land and Investment company asked to made a party defendant to the suit, which order was made, and the said company was given leave to plead.. Thereupon, it filed a demurrer raising the same questions presented by the demurrers of the other defendants. Upon the hearing of the demurrers as stated above, they were all sustained, and plaintiff refusing to plead over, judgment was rendered for defendants, and plaintiff appealed.

Opinion of the court by

BURWELL, J.: In this case, we are called upon to determine whether or not the trial court had jurisdiction of the subject of the action. The defendant in error insists that it had not, and for that reason this court should dismiss the appeal.

The question of jurisdiction has been frequently discussed by the different courts of the country, including the supreme court of the United States, which has been several times called to pass upon this question. Before entering upon a discussion of this matter, perhaps we had better ascertain the meaning of this word, as used by our law writers. The word is defined in Rapalje & Lawrence's dictionary, thus:

"Jurisdiction is the power of a court or judge to entertain an action, petition or other proceedings. When a proceeding in respect to a certain matter can only be

tried in one court, that court is said to have exclusive jurisdiction."

Bouvier says, that: "Jurisdiction is the authority by which judicial officers take cognizance of, and decide cases. Power to hear and determine a cause. The right of a judge to pronounce a sentence of the law on a case or issue before him, acquired through due process of law. It includes the power to enforce the execution of what is decreed."

Webster defines jurisdiction to be: "The legal power, right or authority of a particular court to hear and determine causes; to try criminals or to execute justice. Judicial authority over a cause or class of causes, as certain suits or actions, or the cognizance of certain crimes, are within the jurisdiction of a particular court; that is, within the limit of its authority or commission."

In the case of *The State of Rhode Island v. The State of Massachusetts*, 12 Pet. 655, Justice Baldwin, speaking for the court said: "However late this objection may be, (meaning the jurisdiction of the court,) or may be made in any cause, in an inferior or appellate court of the United States, it must be considered and decided before any court can move one further step in the case, as any movement is necessarily an exercise of jurisdiction." Then the learned justice proceeded to define its meaning thus: "Jurisdiction is the power to hear and determine the subject matter in controversy between parties to a suit; to adjudicate or exercise any judicial power over them; the question is, whether on the case before a court, their action is judicial or extra-judicial, with or without the authority of law, to render a judgment or decree upon the rights of the litigant parties. If the law confers the power to render a judgment or decree, then the court has

jurisdiction; what shall be adjudged or decreed between the parties, and with which is the right of the case, is judicial action, by hearing and determining it." Citing authorities.

The American and English Encyclopaedia of Law, vol. 12, bottom page, 244:

"Jurisdiction is authority by which judicial officers take cognizance of and decide causes; or, as it has been most frequently defined, the power to hear and determine a cause. The definition thus limited, implies that if a court having the power to hear and determine a cause, enters a judgment therein, the validity of such judgment is not affected by the power of the court to enter the judgment in question. To escape this difficulty, there is a tendency in the latest decisions in the United States, to hold that jurisdiction is not only the power to hear and determine, but also the power to render the particular judgment entered in the particular case."

The supreme Court of Massachusetts, in the case of *Hopkins v. the Commonwealth*, 3 Met. 462, says: "The word *jurisdiction* is a term of large and comprehensive import, and embraces every kind of judicial action upon the subject matter, from the finding of the indictment to pronouncing sentence." *Jones v. Brown*, 54 Iowa, 74-- 79: "Jurisdiction is defined to be the authority of law to act officially in the matter then in hand." *Mills v. Commonwealth*, 13 Penn. State, 627--630: "Jurisdiction in courts is the power and authority to declare the law."

The subject of the action in the present case is the equitable title to the land in controversy. The plaintiff commenced his action in the district court, alleging a certain state of facts, and praying for certain relief. Now, if the district court did not have juristdiction of the cause of action, what court had? Or were there no courts to

which he could apply for relief? The court had jurisdiction of the parties because summons was duly issued and served; and the district court alone can try this class of cases. The suit involves the question of chancery jurisdiction, and the Organic Act of this Territory has vested that power in the supreme court and in the district courts. An examination of the authorities will show, beyond any question, that the district courts have jurisdiction in all actions to declare a resulting trust, when land has been by fraud or mistake of law, deeded by the officers of the government to one not entitled thereto; provided, the plaintiff in addition to showing such fraud or mistake as to the law governing such case, also pleads and proves such facts as will show that he has some interest in the land which, if the law had been properly applied, would have given it to him.

The case of *Moore v. Robbins*, 96 U. S. 503, is squarely in point, and supports the rule just stated. Justice Miller, speaking for the court said:

"That the decision of the officers of the land department, made within the scope of their authority on questions of this kind, is, in general, conclusive everywhere, except when reconsidered by way of appeal within that department; and that as to the facts on which their decision is based, in the absence of fraud and mistake, that decision is conclusive, even in courts of justice, when the title afterwards comes in question. But that in this class of cases, as in all others, there exists in the courts of equity, the jurisdiction to correct mistakes, to relieve against frauds and impositions, and in cases where it is clear that those officers have, by a mistake of the law, given to one man the land which, on the undisputed facts belonged to another, to give appropriate relief."

This same doctrine was reiterated in the case of *St. Louis Smelting and Refining Company v. Thomas Kemp et*

*al.*, 104 U. S. 636, and in *Quinby v. Conlan*, 104 U. S. 420.

The question of jurisdiction can be raised by demurrer, under our statute. Section 89 of Procedure Civil of the 1893 Statutes provides:

"The defendant may demur to the petition only when it appears on its face, either: First, that the court has no jurisdiction of the person of the defendant, or the subject of the action."

The expression, "subject of the action," as used in the Statutes, is synonymous with, "subject-matter."

Bouvier defines "subject-matter" to be, "the cause; the object; the thing in dispute. It is a fatal objection to the jurisdiction of the court when it has not cognizance of the subject-matter of the action, as, if a cause exclusively of chancery jurisdiction, were brought in a court of common law, or a criminal proceeding in a court having jurisdiction in civil cases only."

The definition given by Bouvier, ought to settle the question of jurisdiction in this case, and would, were it not for the fact that we are confronted with a decision of our own court, in which the question of jurisdiction is discussed and determined. Defendants in error cite this decision, viz: *Meyers v. Berry*, 3 Okla. 612, in support of their demurrers to the jurisdiction of the court in this case.

The case of *Meyers v. Berry, supra,* was an action commenced in the district court of Payne county, by one Wesley Meyers against William E. Berry, to charge Berry as trustee of certain town lots in the town of Stillwater. A trial was had between the parties before the townsite board, and a townsite deed issued to Berry. Meyers then brought his suit to declare a resulting trust. In the su-

preme court, the defendant raised the question of juris-
diction; and the court in defining jurisdiction, said:

"Jurisdiction is the power to hear and determine the
subject matter in controversy between parties to the suit,
to adjudicate or exercise any judicial power over them,
and when this power is absent, the court is without juris-
diction. When it is apparent from the complaint that the
court has no power to determine the matter complained
of in the petition, or where the petition fails to state such
a case as will give the court jurisdiction, then the objec-
tion may be made at any time, and whenever the matter
is brought to the attention of the court, in any manner,
it should refuse to proceed further and dismiss the pro-
ceeding."

The court then discussed the petition, a copy of which
is included in the opinion, and observed that the petition
contained no allegation of fraud on the part of the town-
site board; that the findings of those officers on questions
of fact, where there in a conflict, is conclusive, and that
in order to present the question as to whether or not the
trustees misapplied the law, it would be necessary to ac-
company the petition with the findings of fact upon which
they made their ruling, in order that the court might
determine, as a matter of law, whether their applica-
tion of the law was correct. And finally in conclusion
said:

"The court has no power or authority to review the
facts or weigh the evidence taken before the board, in
order to determine whether they arrived at proper con-
clusions of fact.

"The petition is drawn upon the theory that the court
has original jurisdiction to try and determine the same
questions of fact that were passed upon by the townsite
trustees. This is an erroneous theory.

"The complaint does not state such a case as will author-

ize a court of equity to hear and determine any question thereby presented, and does not confer jurisdiction on such a court to interfere with the findings of the officers whose duties it was to determine the rights of the parties. Hence, the district court was without jurisdiction to hear and determine the matters complained of, and was without authority to pass upon the questions of fact presented by the complaint, and it was error to render any judgment thereon."

This case, from a casual reading, would seem to support the contention of defendant; but we hardly think that the court intended to lay down the rule that the district courts have no jurisdiction in that class of cases. The petition in that case did not state facts sufficient to constitute a cause of action, and the court could not render the kind of a judgment prayed for, because the facts pleaded would not support it. It is also quite probable that the justice who wrote the opinion in that case, had in mind the rule laid down by the supreme court of the United States, relative to jurisdiction, but failed to distinguish between the cases in which the rule was announced in that court and the case then under consideration.

Justice Field, speaking for the supreme court of the United States, said:

"The doctrine that when a court has once acquired jurisdiction, it has the right to decide every question which arises in the cause, and its judgment, however erroneous, cannot be collaterally assailed, is undoubtedly correct as a general proposition; but, like all general propositions, is subject to many qualifications in its application.  *  *  The doctrine is only correct when the court proceeds after acquiring jurisdiction of the cause according to the established mode governing the class to which the case belongs, and does not transcend, in the extent,

or character of its judgment, the law which is applicable to it." (See Amer. & Eng. Enc. of Law vol 12, p. 248.)

This is as far as the rule laid down in the case of *Meyers v. Berry, supra*, can be extended. The court had jurisdiction of the subject matter, or of the subject of the action, but it did not have jurisdiction on the facts pleaded to declare Berry to be a trustee for the benefit of Meyers; and had the court rendered such a judgment, it would have exceeded its jurisdiction, under the rule laid down by Justice Field, but not because it had no jurisdiction of the subject of the action. It would have been because the court, under the facts pleaded, had no power to render that kind of a judgment. If a court has jurisdiction of the persons to the action, and the cause is the kind of a cause triable in such court, it has jurisdiction of the subject of the action, and has power to render any rightful judgment therein.

The case of *Hunt v. Hunt*, 72 N. Y. p. 217, is squarely in point. Folger, J., speaking for the court, said, speaking of jurisdiction:

"Power given by law to a court, to adjudge divorces from the ties of matrimony, does give jurisdiction of the subject matter of divorce. Though the proceedings before that court, from first to last of the testimony, in an application for divorce, should show that a state of facts does not exist which makes a legal cause for divorce, yet it cannot be said that the court has not jurisdiction of the subject matter; that it has not power to entertain the proceedings, to hear the proofs and allegations, and to determine upon their sufficiency and legal effect. Then, jurisdiction of the subject matter does not depend upon the ultimate existence of a good cause of action in the plaintiff, in the particular case. * * Jurisdiction of the subject matter, is power to adjudge concerning the general question involved, and is not dependent upon the

state of facts which may appear in a particular case, aris-
ing, or which is claimed to have arisen, under that general
question.    *    *    So that there is a more general mean-
ing to the phrase, '*subject-matter*,' in this connection, than
power to act upon a particular state of facts.    It is the
power to act upon the general, and so to speak, the ab-
stract question, and to determine and adjudge whether
the particular facts presented call for the exercise of the
abstract power.    A suiter for a judgment of divorce may
come into any court of the state in which he is domi-
ciled, which is empowered to entertain a suit therefor,
and to give judgment between husband and wife, of a
dissolution of their marriage state.    If he does not estab-
lish a cause for divorce, jurisdiction to pronounce judg-
ment does not leave the court.    It has power to give
judgment that he has not made out a case.    That judg-
ment would be so valid and effectual as to bind him
thereafter, and to be *res adjudicata* as to him, in another
like attempt by him.    If that court, however, should err,
and give judgment that he had made out his case, juris-
diction remains in it so to do.    The error is to be corrected
in that very action.    It may not be shown collaterally
to avoid the judgment, while it stands unreversed,
whether the judgment be availed of in the state of its ren-
dition, or in a sister state; granted always that there has
been jurisdiction of the parties to it    *    *    The plaintiff,
however, makes the point against the validity of the judg-
ment, that it was void in Louisiana, as wholly unauthor-
ized by, and in conflict with, the constitution of the state.
And here it is, that it is of import to know what is meant
by the term, 'jurisdiction of the subject-matter.'    If it
means no more than power to act when, and not till when,
a state of facts is proven which exactly squares with the
grounds for divorce prescribed and established by consti-
titional and valid statutes, then we must inquire what
the constitution of the state permits in the way of a statu-
tory regulation, and whether the proofs in any case show
that the court which in that case adjudged a divorce, had

sufficient evidence before it to enable it to give judgment. In effect, we must review the judgment upon the law and the facts. If the term means what we have above pointed out that it does mean, then we are to give credit to the judgment of a court which, having power to act upon the general subject of divorce, has heard the cause and has proceeded to judgment."

When 'a petition does not state facts sufficient to constitute a cause of action, the plaintiff can amend under such terms as may be imposed by the trial court; but if the court has no jurisdiction of the subject, as in the case at bar, to declare a resulting trust, it has no power to grant such leave, and any order made by the court, except an order dismissing the suit and for costs against plaintiff, would be absolutely void. The judgment, where the court has no jurisdiction of the subject of the action, would be that the defendant go hence without day, and he could not be brought back for trial in that suit, by an amendment of the petition. It will be ready seen that if the court has no jurisdiction of the subject, simply because the petition does not state facts sufficient to constitute a cause of action, all such suits would have to be dismissed. This cannot be done. Our statute says such plaintiffs shall have the right to plead over, on such terms as may be imposed by the court.

The subject of this suit was such a cause as could be heard and decided by the district court, and the fact that the right may be with the defendants, and that the facts pleaded will not compel, even if proven, the judgment prayed for, does not go to the jurisdiction of the court over the subject of the action, but to the kind of a judgment that should be rendered. The court in the case at bar had jurisdiction over the subject of the action, and

we so hold. The rule, as stated in the case of *Meyers v. Berry,* *supra,* relative to the question of jurisdiction, is hereby modified to conform herewith.

II. The only other point that it is necessary for us to consider is, Does the petition in this case state facts sufficient to constitute a cause of action? In determining this question, it becomes necessary to decide another question, viz: does one by offering to file a contest against a homestead or townsite entry, acquire any interest in the land? and, if so, is it such an interest that equity will protect by decreeing a resulting trust, after the patent has issued to the entryman against whom the contest was offered?

In deciding these question, it perhaps would be well for us to take into consideration the powers and duties of the honorable secretary of the interior, and of the subordinate officers of the interior department, relative to the primary disposition of the public land, under the provisions of the homestead laws of the United States.

The homestead laws were passed for the purpose of enabling persons, who were homeless, and unable to buy lands in the older states, to acquire homes for themselves and families, and for the further purpose of inducing people to settle in the then new and sparsely settled states of the west. The law gave to all persons over twenty-one years of age, and to all heads of families, the right to enter, not to exceed one hundred and sixty acres of land; provided, however, that such persons were native born, or naturalized citizens, or had declared their intentions to become citizens of the United States.

Recognizing the fact that it could not foresee all of the contingencies and difficulties that would necessarily arise in putting these laws into force, congress gave to

the interior department power to adopt rules and regulations governing the proceedings in public land matters. These rules, when within the scope of the power granted by congress, have the same force and effect as laws regularly passed and put into operation. They have the same force and effect as rules and regulations adopted by a court of law or equity. The honorable secretary of the interior has several times held, and correctly, too, that these rules have such effect. It must not be forgotten, though, that the right to contest an entry, is a right that is given by congress; yet, this right must be exercised under such rules and regulations as are prescribed therefor.

When a party files a homestead entry on a piece of government land, he, by such act, impliedly agrees to fulfill the laws regarding residence, improvement and cultivation. Should he violate their provisions by failing to comply with their demands in those respects, he is subject to contest; and one who files a contest against an entryman, stands in the same position as one who informs the state of the violation of one of its penal laws. The government, under the present law, gives to one who secures the cancellation of a homestead entry by contest, a preference right for a certain number of days to enter the land embraced therein. This preference right of entry is in the nature of a reward, for informing the government of the violation of the law. By the laws of several of the states, persons are allowed a certain per cent. of the fines which may be collected from persons on conviction for the commission of certain offenses. Could it be said that such informant has any special right in law to have the prosecuting officer prosecute such a case, if, in his judgment, the evidence was insufficient to secure a

conviction? Certainly not. Would it not also be true that the land department has the right to deny any contest when in the judgment of its officers the allegations contained therein are insufficient?

Originally, a contestant who secured the cancellation of an entry, had no more right to the land than anyone else. Later, he was given tue preference right of entry for a certain number of days, but this right was a personal right. Finally, congress passed a law which made a contestant's right the subject of inheritance by the contestant's heirs; but conceding that to be the law at the present time, the contestant's interest is a contingent one which may be defeated  In the case at bar, the appellant has not a single equity in his favor. He was not a settler upon the land. He had made no improvements thereon. He never offered any filing of any kind in the land office until the appellee, Lynch, had submitted his final proof and changed his homestead entry to a townsite entry, and paid his money for the land. If an application to contest an entry and the tender of the land office fees gives one a vested right in the land embraced in the entry, we can look forward to crowded court dockets and to almost endless litigation over land titles in Oklahoma; and before a court should lay down such a rule, the law ought to be clear and specific.

The acts of congress relative to contests of entries, pre-emption, homestead, timber culture, townsite, etc., are numerous, and as it would take considerable space to quote them, we will content ourselves by commenting upon them generally.

It is well established that contests are authorized for any violation of the law as to residence, improvements,

or disqualification to make the entry in the first instance. And here is a case where the department refused to entertain the contest offered, the ground being disqualification to enter the land. The facts on which Parker relies for a cancellation of the entry, were fully set out in affidavits filed in the department. Even Lynch, and his alleged agent, Pryor, filed affidavits in which they state the manner in which Lynch's application was filed. These affidavits, as well as the affidavits filed by Parker, were all considered by the department, and involved the question as to whether or not Lynch was disqualified. The land department, on the showing made by both parties, found and held that Lynch was a qualified entryman. That being true, should this court disturb such findings? Not unless the ruling of the department was clearly erroneous when applied to the facts in the case, or unless fraud was practiced by the prevailing party or by the officers of the department.

How far the court ought to follow the rulings of the interior department, as to the qualifications of entrymen, who have been in the country prior to the opening of lands to settlement, during the prohibited period, and who have been permitted to make entry of land, is a question not easily answered; and while that issue is presented in this case, it is not necessary to discuss it because it should be decided on other grounds. The real question is, what right has Parker in this land? In order to win, he must have a better equity than Lynch. He must have had an interest in the land that would have ripened into a title if the law had been properly administered. It is not sufficient for him to allege that Lynch was disqualified. If the government has given a patent to one who is a "sooner," it alone can bring a suit to can-

cel the same. One who has no interest in the land cannot complain, because he could not be injured by the action of the government in issuing a patent for the land to another.

In the case of *Bohall v. Dalla,* 114, U. S. 47, Mr. Justice Field, speaking for the court, said:

"We do not think the claim of the defendant to the equitable relief he seeks, can be sustained on the ground stated in his answer or cross-complaint. To charge the holder of the legal title to the land under a patent of the United States, as a trustee of another, and to compel him to transfer the title, the claimant must present such a case as will show that he himself was entitled to the patent from the government, and that in consequence of erroneous rulings of the officers of the land department, upon the law applicable to the facts found, it was refused to him. It is not sufficient to show that there may have been error in adjudging the title to the patentee. It must appear that by the law properly administered, the title should have been awarded to the claimant. * * It is therefore immaterial for the decision of this case what our judgment may be upon the conclusions of those officers as to the possession of the patentee."

In the case of *Sparks v. Pierce,* 115, U. S. 408, the court said

"Mere occupancy of public lands and improvements thereon give no vested right therein as against the United States, and consequently, not against any purchaser from them. To entitle a party to relief against a patent of the government, he must show a better right to the land than the patentee, such as in law should have been respected by the officers of the land department, and being respected, would have given him the patent. It is not sufficient to show that the patentee ought not to have received the patent. It must affirmatively appear that the claimant was entitled to it, and that, in consequence of erroneous rulings of those officers on the facts existing, it was denied to him."

Attention is also called to the case of *Lee v. Johnson*, 116, U. S. 49:

"The court does not interfere with the title of a patentee when the alleged mistake relates to a matter of facts concerning which those officers may have drawn wrong conclusions from the testimony. A judicial inquiry as to the correctness of such conclusions would encroach upon a jurisdiction which congress has devolved exclusively upon the department. It is only when fraud and imposition have prevented the unsuccessful party in a contest from fully presenting his case, or the officers from fully considering it, that a court will look into the evidence. It is not enough, however, that fraud and imposition have been practiced upon the department, or that false testimony or fraudulent documents have been presented; it must appear that they affected its determination, which, otherwise, would have been in favor of the plaintiff. He must in all cases show that but for the error or fraud, or imposition of which he complains, he would be entitled to the patent; it is not enough to show that it should not have been issued to the patentee. It is for the party whose rights are alleged to have been disregarded that relief is sought, not for the government, which can file its own bill when it desires the cancellation of a patent unadvisedly or wrongfully issued."

In the case of *Quinby v. Conlan, supra,* it is said:

"And we may also add in this connection, that the misconstruction of the law by the officers of the department, which will authorize the interference of the court, must be clearly manifest, and not alleged upon a possible finding of the facts from the evidence different from that reached by them. And where fraud and misrepresentation are relied upon as grounds of interference by the courts, they should be with such fullness any particularity as to show that they must necessarily have affected the action of the officers of the department.

Mere general allegations of fraud and misrepresentation, will not suffice."

One other case decided by the supreme court of the United States should be here mentioned. It is *The St. Louis Smelting, etc., Co. v. Kemp*, 104, U. S. 636. The court said:

"If in issuing a patent, its officers, (referring to the officers of. the interior department,) took mistaken views of the law, or drew erroneous conclusion from the evidence, or acted from imperfect views of their duty, or even from corrupt motives, a court of law can afford no remedy to a party alleging that he is thereby aggrieved. He must resort to a court of equity for relief, and even there his complaint cannot be heard unless he connect himself with the original source of title, so as to be able to aver that his rights are injuriously affected by the existence of the patent; and he must possess such equities as will control the legal title in the patentee's hands. *
* It does not lie in the mouth of a stranger to the title to complain of the acts of the government with respect to it. If the government is dissatisfied, it can, on its own account, authorize proceedings to vacate the patent or limit its operation."

Under these decisions, if Parker had no interest in the land, he cannot maintain this suit. The only thing that Parker ever did, was to file a protest against Lynch's final proof, and ask that he be allowed to contest the entry of Lynch, after Lynch had made final proof, and paid his money to the government for the land. This is not sufficient to authorize the court to declare Lynch a trustee for his benefit. The offering to file a contest against an entry gives a party no interest in the land. It gives him no vested right in any sense of the word. If the land department entertains a contest, and files it, the party filing the same has a right to have it heard, but he has no right in the land itself. He does not have

to be a qualified entryman to initiate or prosecute a contest. He does not acquire any interest in the land, under any fair construction of the law, until after the homestead entry against which his contest was directed, had been cancelled as a result of his contest. The fact that congress passed a law authorizing the heirs of a contestant to prosecute a pending contest to final determination, and to enter the land in the event of a successful result of the same, did not give to a contestant or to his heirs any interest in the land to any greater extent than they had prior to the passage of such act. This act was passed to carry out as fully as possible the spirit of the law that was then in force, but gave no greater rights, except such as were expressed in the law. Under the law, as it then existed, a contestant had to pay all the expenses of the contest, except in cases of prior settlement, in which the parties each paid his own cost. Hundreds of contests were pending in the different land offices of the United States. In many cases the contestant had expended large sums of money in prosecuting the same. In the event of the contestant's death, his heirs got no benefit of the money thus expended, and if the entry was cancelled, the party first applying could enter the land. Congress recognized this fact, and passed the law just referred to; so that a contestant's heirs could reap the fruits of his contest; but the heirs were given no greater right than the contestant had. If the heirs of a contestant fail to prosecute the contest to final determination, secure a cancellation of the entry and enter the land, their rights cease; and as to whether or not they do this is optional with them.

In the case of *Savage v. Worshan*, 72 Fed. Rep. 601, (Circuit Court, southern district, California,) the court said:

"Complainant derives his warrant for thus attacking defendant's title from a preference right of entry claimed by him under section 2, of the act of May 14, 1880.    *  * This section reads as follows: 'In all cases where any person has contested, paid the land office fees, and procured the cancellation of any pre-emption, homestead or timber culture entry, he shall be notified by the register of the land office of the district in which such land is situated, of such cancellation, and shall be allowed thirty days from the date of such notice, to enter said lands, provided, that said register shall be entitled to a fee of one dollar for the giving of such notice to be paid by the contestant, and not to be reported.' The rule is well settled that the court will not interefere with the title of the patentee of the United States, unless the adverse claimant shows that, but for the error or fraud, or imposition of which he complains, he would be entitled to the patent. It is not enough to show that the patent should not have been issued to the patentee.    *  * Assuming, without deciding, however, that a preference right of entry under the aforesaid act of 1880, is such an entry as will authorize an attack upon a patent obtained adversely thereto through fraud or mistake, the question arises, does the bill show that complainant has, or ever had, the preference right of entry which he claims? To the acquisition by him of this right, three things are necessary: First, he must have been a contestant of the defendant's homestead entry; second, he must have paid the land office fees; and, third, he must have procured the cancellation of said entry. The bill fails to show either the first or third of these pre-requisites. With reference to the first, it is to be observed that the secretary of the interior, on September 17, 1889, expressly held that the complainant was not a contestant, while, so far as concerns the third, the whole bill is framed on the theory and directly avers that the defendant's homestead entry was never cancelled, but on the contrary, ripened into a patent."

Lynch's entry was never cancelled as a result of a contest filed by Parker, therefore, Parker could not claim any preference right of entry. Without deciding what the rights of a party, who has secured the cancellation of an entry, are, we hold that the fact that one offers to contest an entry, even though his grounds were valid and the contest should have been entertained and the hearing granted, yet, if the department rejected his contest, he, by the offering of such contest, acquired no interest whatever in the land, and he cannot maintain an action to declare the patentee, who was the entryman at the time of the offering of his contest, a trustee for his use and benefit.

It is shown by the record and briefs in this case that on the very day that the plaintiff filed his protest against the final proof of Lynch, and asked to contest Lynch's entry, there were improvements of the value of over $35,000 on the tract in controversy, and that the improvements thereon at the present time are worth five times that amount, and that a large number of persons were then occupying the tract for trade and business. These facts were know to the department, and it had a legal right, even if Lynch were disqualified, to refuse a homestead application for the land and reserve it for townsite purposes.

The plaintiff comes into this court without a single equity in his favor; without any interest in the land and without any standing that entitles him to relief. The petition did not state facts sufficient to constitute a cause of action, therefore the defendant's demurrers were properly sustained.

There are other phases of this question which might

be discussed, but we deem it unnecessary, as the points heretofore considered and decided control the judgment that must be rendered.

For the reasons herein stated, the judgment of the lower court is hereby affirmed at the costs of the appellant.

McAtee, J., not sitting; all of the other Justices concurring.